Good morning. May it please the Court, Mr. Stock, my name is Megan Healy on behalf of the United States. Article 3A of the IADA, as interpreted by the Supreme Court, this Court, and this Court's sister circuits, makes clear that the U.S. attorney, as the prosecuting officer, and the district court must both receive actual notice of a prisoner's speedy trial demand to trigger the IADA's 180-day speedy trial clock. Here, neither did. Because the IADA's speedy trial clock never started running, the district court erred in dismissing the charges based on a speedy trial violation. The United States respectfully asks this Court to reverse and remand for further proceedings. At the outset, it is undisputed in the record that the district court never received notice of Mr. Koon's IADA speedy trial demand until the January 22nd, 2024 evidentiary hearing on his motion to dismiss. Counsel, can I ask a question? I'm just really curious. I don't know how relevant it is, but it's a without prejudice dismissal. Yes, Your Honor. And so I'm trying to figure out why the United States is appealing here rather than just recharging him. Is there something I'm missing? It seems like the day after the dismissal, in fact, the United States could have recharged him. That is correct, Your Honor, but it's a strategic decision in this case because a reversal puts us back into the position that we were in which a guilty plea has been entered, as opposed to starting anew, renegotiating years later.  So it's a strategic decision that we want to preserve that guilty plea and preserve the sentencing. Is it clear that the guilty plea was eliminated by the decision? The guilty plea was a separate act. I mean, it was while this dispute was in the motion stage. Yes, Your Honor. It was a guilty plea. Is it clear that the district court's decision somehow nullifies or invalidates the plea? Yes, Your Honor. If you look at the plea agreements, in this case, the defendant's appeal waiver, paragraph 21 in the plea agreement. You've got to speak up. I'm not following. I'm so sorry, Your Honor. I'm hearing one out of three words. My apologies. The plea agreements in this case recognized that it was a conditional plea agreement and that if the defendant lost his motion to dismiss, he retained the right to appeal that denial of a dismissal of his motion and recognized that otherwise, if he won, charges would be dismissed. And so, yes, the effect of the denial or the granting of the motion to dismiss would — it was the understanding of the parties would allow the defendant to withdraw the plea and that the plea would be null. There's some discussion about the effect of this at the evidentiary hearing to make sure that all parties were on the same page as to how this would play out. Did the district court approve what the parties were talking about? Yes, Your Honor. In plain language? Yes. Okay. Thank you. Proceed. Thank you. So the lack of notice to the district court, which is undisputed, that fact alone requires reversal in this case. But beyond that, the district court misapplied Supreme Court and this Court's precedent in to reach its conclusion that notice to one entity of the federal government constitutes notice to all. This Court and the Supreme Court in FECS, Dooley, and Daley has recognized that strict compliance with the agreed-upon procedures of the Interstate Agreement on Detainers Act is necessary to effectuate orderly, an orderly effectuation of that system. And for example, this Court's Daley case from 2007 is quite similar to the facts here, where prison officials in that case failed to send an inmate's speedy trial demand on to the district court for the District of Minnesota and the U.S. Attorney's Office. I've read all your cases and they don't solve the problem. One question that's not addressed at all in the briefs that I saw is, what, in your opinion, is the U.S. Attorney's obligations under Section 5 of the IADA? I'm sorry, Your Honor? Section 5 requires everybody in the government to cooperate in. Yes. Yeah. What are the U.S., in this context, what is the U.S. The U.S. Attorney's obligation is once we receive actual notice of a speedy trial. That's not what, the statute doesn't say after you get notice, you've got obligations. It imposes obligations to make the acts, to effectuate the act's purposes. Yes, Your Honor. Which in this case would have been calling DEA. What's going on? Well, Your Honor. To solve the problem. Your Honor, on the record of this case, there's no indication that the DEA here asked for a copy of the disturbed detainer to be returned to it for its records. And the form specifically. You don't have to repeat the facts that are in the brief. I'm just saying, on those facts, the U.S. Attorney should have said, wait a minute, what's going on here? Well, Your Honor, as a. And that triggers my question about, is there any case law or government policy on what the U.S. Attorney's obligations are to achieve the intent and purpose of Section 5? Yes, Your Honor. The Speedy Trial Act tells us that once someone is serving a term of imprisonment, we either serve a detainer, as we did here under the IADA, or we bring the person for prosecution via a writ. We did both in this case. You know, okay. And as far as. I can, you know, I'm not talking about what does the Speedy Trial Act say, I'm talking about what does the IADA say. And it says in Section 5, everybody needs to make sure that this process works. Yes, Your Honor. And the U.S. Attorney here did nothing except sit back and then claim horrible surprise when the issue was raised years later. Your Honor, I respectfully disagree. In this case, the U.S. Attorney's office, my office, did exactly what it was supposed to do.  That's the question. Very promptly after Mr. Kuhn was done serving his state sentence, we writted him and we served a detainer. Belton's to Sanders' approach. At that point. All right, you don't have an answer to the question. No, Your Honor, I'm getting to my answer to the question. At that point, under the IADA, it's up to Mr. Kuhn to request the speedy trial demand or not. Had we received that demand, we would have ensured that would process move forward in federal court. Until we have actual notice of that demand, there is nothing the U.S. Attorney's office can do in that case. No, that's not. If you would say there's nothing they have to do, that would be argument. There's nothing they can do. That's just flat wrong factually. Nothing that we are obligated to do. OK, but don't say there was nothing you could have done to discover this shocking. And, Your Honor. Failure by the state, by the companion federal agency and the state custody people. And, Your Honor, with respect to your question about Article V and the parties working together, the appropriate remedy when one party state recognizes that another party state is not complying with the procedures in the IADA, which is what happened here, is for the two party states to communicate about that to remedy it on a going forward basis. In this case, it would be a conversation between the U.S. Attorney's office and the North Dakota Attorney General. The North Dakota... We've done that. Except it's more simple. The simple thing in this case, given there was going to be a response to DEA, and then if there was a request from the defendant, there would be notice. Presumably from the North Dakota officials. Yes, had they followed... Somebody had to do, was paying any attention to this, was call up DEA and say, did you get a response? And did the response include a check? The box checked. Your Honor, respectfully, that is not what the IADA requires the United States to do. What it requires is for the state prison officials to do exactly what the form that he was served with told them to do. Under Article III, Section B, they must promptly forward any IADA speedy... I thought I had with me the text of Section V, but I know when I read it, what it says. It does have a cooperation clause in Title V. Yes, Your Honor. Do you have the words of it there? I don't have Article V right in front of me. I guess it's here. Go ahead. Yes. Your Honor, that is on a stepping back on a broader basis that once a deficiency has been recognized that the parties cooperate to effectuate... In the Fick's case, did the Supreme Court reference Article V? No, Your Honor. Not that I remember. Not at all. It references Article III a lot, right? Yes. This is all about Article III. Of course, that's a different... Because that is a real state involved, right? Pardon me? That is a two states were involved in that. It was two states involved, Your Honor, but the two party states. The analysis is the same as here. We have a party state, United States, party state. I was trying to think why they wouldn't have mentioned it. That changes the context a lot. Article V, I can, based on all of the cases that I've read, Article V has not been dispositive or that I recall even discussed when we're talking about a speedy trial violation when the state fails to follow the procedures of Article III. Not even by the Ninth Circuit? Are you sure it's not in the Ninth Circuit's case, Johnson, and there are other cases? You know, Your Honor, I'm not recalling specifically in Johnson. Proceed. My apologies. There's a real irony here in that you're relying on facts. A decision in which Justice Scalia, in a rare moment, found that a statute was ambiguous. You are now relying on its supposed plain meaning in Article IIIa. No, Your Honor. There's actually two statutory interpretations in facts. The first statutory interpretation, the Supreme Court, written by Justice Scalia, said it is self-evidently true that delivery is required to the prosecuting officer and to the district court. That is the first textual holding. Only once those two deliveries have occurred do you get into the second textual analysis in facts, which is the court saw the text was indeterminate as to when we start counting, when the prisoner gives the submission to the prison official or when the district court and the prosecuting officer receive the notice. That's the textual indeterminacy in facts that the Supreme Court worked through and found based on textual hints and considerations and policy arguments that the clock started ticking when the receipt was made or when the entities in the receiving state received it. But the preparatory textual interpretation in facts is that unquestionably delivery to those two entities must be made before we even talk about whether the speedy trial clock started ticking. I'm not sure that's 100 percent true. Well, that's what facts said. You're right. That's what facts said. But if you read the plain language, I'm not sure that I don't think that there's an ambiguity. I actually think there is. Cause to be delivered. How does a prisoner cause something to be delivered? They give it to the people who need to deliver it for them. And I understand that facts says something entirely different. But I do think there's some ambiguity in the plain language here. Because you could, a different holding from the Supreme Court in facts would have been entirely reasonable. Well, what we are left with is facts. No, it's fair. And how this court has interpreted it and other circuit courts have interpreted it. And cause to be delivered has put the burden on the prisoner and the ascending state to effect actual delivery to the district court and to the U.S. Attorney's Office. That's the law that we are left with and those interpretations of it. Stepping back. Oh, I see my time is ticking. Here's section five. All courts, departments, agencies, officers, and employees of the United States and the District of Columbia are directed to enforce the agreement on detainers and to cooperate with one another and with all party states in enforcing the agreement and effectuating its purpose. Yes, Your Honor. And I believe that we have done that here. Right. Yeah, I know. How? Other than just, you know, doing, taking the initial steps, there was no follow. We promptly served the detainer that told Mr. Kuhn exactly what needed to be done. There was no obligation whatsoever to do anything else, period. At that point, if you demand... Under section five. And you've got no case law for that. No, Your Honor. I don't think you don't have a reg or a DOJ policy guidance on that. Your Honor, my understanding is that we did exactly what was expected. And you are just encouraging DEA to do this wrong again and again. No, Your Honor, because that is something the district court said, but that is not true. If we had followed what the IADA tells us to do, if the state had, and if they had followed exactly what the detainer told them to do, a Federal agency is never part of that process. It should go directly from the prison officials to the U.S. attorney in the district court. Federal agencies have no role in that process under the IADA. And under the form in this case, one... I would say section five is absolutely to the contrary in its purpose and intent. And, Your Honor... When the government is one of the states. And, Your Honor, that is looking at a section five, I would argue that it's big picture. We all need to work together. And in this case, when deficiencies are located... But all you have to do is blame it on the state now. It's all North Dakota's fault. No. And so we win. May I answer the question, Your Honor, respectfully? In this case, I would understand section five to be, we see that there's a deficiency in the state. Now it's on us as the U.S. attorney's office to go to the North Dakota attorney general as the administrator of the IADA in that state and say, hey, we saw you're not following the procedures. We need to work this out so it doesn't happen in the future. That's what I understand article five to mean. In the future, you didn't do that here. I said the easy thing was to call DEA. Also could have called North Dakota. In this case, we had no actual notice until the evidentiary hearing in January 2034. The district court thought the actual notice, there was some considerable reason to doubt. Thank you, Your Honor, for your time this morning. And the United States respectfully asks that the court reverse and remand for further proceedings.  Good morning. I may please the court, counsel. My name is Charlie Stock. I'm here on behalf of Jerome Kuhn. It sounds as though from the court's inquiries with the government that the court is well aware of the factual background here. And that brings me to the first point that I was going to make is that this, the factual background or evidentiary background of this matter is substantially different than that of FECS. And I say that because FECS, the issue before the FECS court was, when did the 180 days start? And that was the sole focus of their analysis of the How about this court's opinion in Daly? I'm sorry? How about this court's opinion in the Daly case, D-A-L-Y? Yeah. 07. I'll get there. If I may. I'd like you to address it now because it says the FECS, it relies on FECS, forecloses constructive delivery, period, period. How do you address that? So Daly, the state actor in that one, they actually did not even bother to forward it to anyone in the federal government, right? But here we have, we're factually distinctive here as well. And here's why, is because here we have the federal government through the DEA sending a detainer act, detainer to the North Dakota Department of Corrections that was holding the detainer. It's their detainer. It's their language. And here's the thing, the government never produced any evidence about how or in what manner they sent the detainer to the Department of Corrections, North Dakota Department of Corrections. The district court found it as a fact though, right? Excuse me? The district court found it as a fact though. It was delivered in accordance with the detainer's act, right? It was delivered. Yes. We don't know why, but I think that's important. And the reason I say that, Your Honor, is that within the detainer itself, it says that from the DEA, from the government, it says, please acknowledge receipt of this detainer. In addition, please provide one copy of the detainer to the prisoner. Return one copy of the detainer to this office in the enclosed addressed envelope. Well, and that's the record document 119. But then we have record document 148 that shows that the detainer, once signed by Coon and checking the box for the speedy trial request, saying, yes, I want one, it's actually emailed back to the DEA agent who sent it. That would have been in early March, I'm sorry, in January, late January of 2022. Well, I just wonder, so I think this is an unfortunate set of circumstances. There's no question about that. I just wonder whether the argument, there's no collective knowledge doctrine when it comes to this. It's not as if you send it to the DEA, the U.S. attorney is automatically assumed to have knowledge. So we don't have that. And I wonder whether it's a different case if somehow the U.S. attorney finds out about it, that that's a different case than a situation in which they're, I think it's undisputed here, they were completely ignorant. They didn't proactively do anything, but they also didn't ignore anything either. Right. I agree with that. And that's, I think, Justice Logan's reference to Article V then is the cooperation clause of the Penalty Act. Article V is not cited in any of the briefs here, right? It's cited in mine. I quoted it. Article V? Yeah, I brought it up because I knew that. It wasn't in your table of contents. I looked at it quickly. It's on page 20. I quoted the exact language. Sorry, I looked at your table of contents. And that's my argument is that we know that the U.S. attorney involved here was aware of that the detainer had been sent. And the reason we know that is because at arraignment, there was a discussion, and this is all quoted in my brief, there was a discussion about whether another detainer needed to be  And the U.S. attorney says, I'll check with the agent and maybe have him send another detainer. So he, there was, so the DEA or the United States Attorney's Office here for the District of North Dakota was cooperating with DEA, state government agency, in getting this initial detainer to Department of Corrections for Mr. Kuhn to sign. Does that make it worse for you though? Because I mean, presumably, again, there's no evidence the U.S. attorney ever knew about that. So if they were cooperating, then Section V is satisfied. Okay. I think it actually helps my argument, Your Honor, because we know that the signed detainer by Kuhn asking for a speedy trial was emailed back to that very same DEA agent with whom the United States attorney was working with. Okay. So then if you put that in the light of the cooperation clause, the DEA is an agent of the United States government, just as referenced in Article V. They're supposed to work among other agencies, including the U.S. Attorney's Office to effectuate the purposes of the act itself. Now, but if there were a finding by the district court that said that somehow the U.S. attorney had known about it because the agent told him, him or her, whoever the U.S. attorney was in the trial court level, I think we'd be in a different spot. I'd be in an even better spot, but I think we'd be in a good spot anyway because ignorance isn't bliss. I mean, here's the U.S. attorney prosecuting Mr. Kuhn, working with the DEA to get a detainer sent to Mr. Kuhn. He gets it sent to him. However, it gets signed by Mr. Kuhn. It gets sent back to that same DEA agent because it says, send it back to me when it's  And then, so we do that. So then also the U.S. attorney can just say, eh, nothing to worry about. But what if, what if, I mean, I don't know if we're all speculating here, but what if it's, hey, what's going on with that detainer, you know, or whatever, and the DEA agent says, haven't received anything? But that's not what happened here. Well, I don't know what happened here because we don't know what happened here. We know the DEA agent received it back. No, but I'm saying what if the DEA agent forgot and told the U.S. attorney, I mean, we had no idea what the DEA agent told the U.S. attorney. Right. And that's part of the problem here is that we don't know what the DEA agent, what he communicated to U.S. attorney because the U.S., the United States government in all these motions never submitted any evidence in that regard. That brings me to the ultimate point, which is, if you're talking about effects in daily, I think the court, even though I think there's ambiguity in the statute, came up with a blanket bright line rule. We're not going to second guess all this. The notice has to be given to the U.S. attorney. We're not going to attribute sending it to another agency, another state, whatever. We're just going to have a blanket bright line rule so we don't get into some of these, these disputes. Which is completely and utterly unfair to a defendant. I don't disagree. But the other thing I'll say is, is this. Let's just assume, for the sake of argument, that in FECS, that the characters or actors were different. And let's say it was a state and it was the federal government that were the players in that one. And let's just say in that, the same scenario that happened here happened. That is, the DEA sent to the state of Michigan where FECS was being held, a signs it, it gets emailed back to the DEA, okay? And the DEA actually communicates with the United States Attorney's Office, which it should. And it gets to the United States Attorney's Office and then the United States Attorney's Office is obviously ethically bound to get it filed with the court. Do you think that the United States Supreme Court in FECS would have said, we don't even need to get to the cause to be delivered because the process and the protocol wasn't followed beforehand? I don't know the answer to that. That's my point.  That's why FECS, that's why this case is factually distinguishable from FECS and Daley and Dooley. And I hear you on the facts, but what about, and Judge Strauss asked it, they really do determine what the terms actually been delivered means. What authority, even the Ninth Circuit, do you have on a different meaning of actually been delivered? I don't, Your Honor, but I also don't have a case, and the government apparently couldn't find one either, that actually construes these kind of scenarios in conjunction with the cooperation clause. Well, what about all the U.S. Marshall cases? There are a lot of U.S. Marshall cases by circuits, three or four of them, right? Right. Where they send it back to the U.S. Marshall and all the other circuits said delivered to U.S. Marshall has not actually been delivered. But again, there's no discussion, no construal of the cooperation clause between and among United States agencies and United States attorneys' offices, courts, and so on. There's no discussion anywhere about that, and I was frankly baffled why no one had ever brought up Article V in the context of these cases, because it certainly is a player. And I'm not saying that this court, you know, needs to overrule Daley or Dooley or disagree with FECS. I just think that this is the case that's a classic example of, you know, one size doesn't fit all here. And I don't think you include Dooley in that. Dooley is the toughest one. Even if the prisoner makes a good faith effort to invoke his rights, he gets no relief. That's a quote. That's Dooley. But again, did this court, did the Dooley court construe and apply the cooperation clause that should be applied in the context of this case? Can you tell us, has anybody construed the cooperation clause in this context? No, not that I can find. Thank you. But that doesn't mean it's inapplicable. It just means no one's ever done it. New argument at some point, you know. That's how law evolves. We're not static. And I really feel the court should strongly consider that. And it doesn't mean that you're disagreeing with the United States Supreme Court and FECS, and it doesn't mean you're overruling those other cases. It means what we have here, and that was the issue as I outlined. Why is the U.S. attorney's failure to follow up and cooperate any worse than your own client's failure to follow up? Well, I don't... Hey, I checked the box. What's happened? Right. Well, but he's told in the government's own document, Your Honor, the detainer, the government wrote this document up. He's told right there that I understand that if I do request a speedy trial, this request will be delivered to the office of the United States attorney who caused the detainer to be filed. Yeah, but you know about the clause, and I'll go quickly, about you're responsible for any delay, and you should periodically inquire. No, it says because delay may be attributable to you. Coon didn't do anything. There was nothing attributable to Coon causing this delay. He signed the data. It says may. It says because it may be, you should periodically inquire. Maybe, but he had done nothing that would be attributable to him. He was in jail. What could he have done? Statute of limitations run. Excuse me? Colonel, statute of limitations run. On the charge, the underlying charge? Not that I'm aware of, no. And I also have just done the discussion about what happens to the guilty plea. Depending on how you folks rule, we're going to be disagreeing with the government on what the aspects are of whether the guilty plea is still in play or not. But that's irrelevant for the purposes of this case. Is there anything in the judgment? Can we simply say it's not eliminated? There was a reference to some agreement. I'd rather you not. Then the district judge signed off on the party's informal agreement that the guilty plea ties with this motion. Well, that's what I, that's what I, my position would be, but. What, what can, what would be, what would, what would be the legal error of us ordering otherwise? I, I did not research nor consider that prior to this morning, Your Honor. So I, I'm not standing here able to give you a, a direct answer. Well, why, why, why did he plea with this, with this, with this issue? Unresolved. There's a lot of, of, of record matters, Your Honor, that, that you're not exposed to, probably, or weren't exposed to in the context of this appeal as far as what the, the focused issue was. And so I don't even want to talk off the record, so to speak. But there was, there was a plea agreement in place. Thanks to all this, all this messing around the guilty go free. Excuse me? Thanks to all this, all these mistakes and, and informal this and that, the, we're, we're looking at the guilty going free. Well, he was never convicted. Because many constables blundered. Well, well, they can recharge, just as, as Ms. Healy mentioned, they can recharge him. That's, I'm certain, they likely will. So I don't think he's necessarily going to go free just by a ruling of this court in, in favor of affirming the district court. But again. I'm sure you've looked at it. You, you, you state to the court as fact that the statute of limitations has not run. As far as I know, it has not run. No. Are you willing to concede that? I don't know if I can do that without the, you know, without the consent of my client sitting, standing here today, Your Honor. But, but. The court would request a letter to, whether you do, whether you concede it or not. Whether I concede that. After, Your Honor. That we would waive any. You have to, you have to consult with your client for that. That we would waive any, statute of limitations and basically say it was told during this time frame. You know, whatever, that, that, that if we, that we have, we, we would not violate the statute of limitations if we ordered the, the, you know what I'm saying. Well, perhaps we can just, I can just submit a letter to the court saying, or advising what the statute of limitations is. If it's not an issue, then I don't have to do the concession. No. I'd like you to consult with your client and give the court a letter as to whether it's conceded for purposes of this appeal. I can. The statute of limitations has not run. I will do that, Your Honor. I think, and you're absolutely right. You need, I would, I would not, it would not be appropriate for you to do that without consulting. Then you'd be. And your client may well say, no, hell no, I'm riding my horse. And he may, and you know, I would, I think I lost any credibility that I may be previously gained with you folks if I would just conceded on the record without talking to my client. So, thank you. We'd ask that the district court's decision be affirmed. Do you want a minute? And actually, I would, I just wonder what the U.S.'s understanding of the statute of limitations is. Yes, Your Honor. The serious bodily injury in this case that was alleged in the initial indictment occurred in January 2021. And so, my understanding of the statute of limitations has not run and will not run until at a minimum sometime next year. January of next year? I, I, I believe that's correct, Your Honor. Thank you. Judge Strauss, I'd like to turn back to some of your questions about, well, would this be a different case if the U.S. Attorney's Office had received notice, which it didn't hear? And cases from other circuits say no, it wouldn't. In the Seventh Circuit's case in Brewington from 2008, the U.S. Attorney's Office did receive notice, and the federal agency received notice, but the district court did not. And the Seventh Circuit found, even under those circumstances, there's no Speedy Trial Act violation. Now, the Seventh Circuit was critical of the U.S. Attorney's approach to speedy trial in this case, but there's still no speedy trial, or I'm sorry, no IADA speedy trial violation. And that was the same outcome in the Tenth Circuit's Washington case. If the Court has no more questions for me, I again thank you for your time and respectfully ask that you reverse and remand for further proceedings. Thank you. Thank you.